## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| CELINE THUM, derivatively on behalf of BOOZ ALLEN HAMILTON HOLDING CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> HORACIO D. ROZANSKI, LLOYD W. HOWELL, JR., KEVIN L. COOK, RALPH W. SHRADER, PETER CLARE, JOAN L. C. AMBLE, MELODY C. BARNES, IAN FUJIYAMA, MARK E. GAUMOND, GRETCHEN W. MCCLAIN, PHILIP A. ODEEN, CHARLES O. ROSSOTTI, and ARTHUR E. JOHNSON, <br><br> Defendants, <br><br> and <br><br> BOOZ ALLEN HAMILTON HOLDING CORPORATION, <br><br> Nominal Defendant. | C.A. No. _____ <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Celine Thum ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Booz Allen Hamilton Holding Corporation ("Booz Allen" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Horacio D. Rozanski, Lloyd W. Howell, Jr., Kevin L. Cook, Ralph W. Shrader, Peter Clare, Joan L. C. Amble, Melody C. Barnes, Ian Fujiyama, Mark E. Gaumond, Gretchen W. McClain, Philip A. Odeen, Charles O. Rossotti, and Arthur E. Johnson (collectively, the "Individual Defendants," and together with Booz Allen, the "Defendants") for breaches of their fiduciary duties as directors

- 1 -

and/or officers of Booz Allen, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Booz Allen, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Booz Allen's directors and officers.

2.      Booz Allen provides consulting services to its clients who are primarily in the government, financial services, healthcare and life sciences, energy, high-tech manufacturing, retail, and automotive industries.  The Company's clients include a diverse base of federal government clients, including nearly all of the U.S. government's cabinet-level departments, as well as top-tier commercial and international clients.

3.      At all relevant times, the Company has derived substantially all of its revenues from its services rendered to the U.S. government.

4.      Booz Allen Hamilton Inc.[1] is the Company's primary operating company and is a wholly-owned subsidiary of Booz Allen.

5.      On June 15, 2017, the Company filed a Form 8-K with the SEC revealing that Booz Allen Hamilton Inc. "was informed that the U.S. Department of Justice is conducting a civil and criminal investigation relating to certain elements of [Booz Allen Hamilton Inc.'s] cost accounting and indirect cost charging practices with the U.S. government."

6.      On this news, the price per share of Booz Allen stock fell $7.43, or 18.9%, from the previous day's closing price to close at $31.90 on June 16, 2017.

7.      The Individual Defendants breached their fiduciary duties by causing the Company to: (1) engage in improper accounting and charging practices with regard to its business with the U.S. government, subjecting it to an investigation by the U.S. Department of Justice (the "DOJ"); (2) engage in widespread fraud at Booz Allen's Charleston, South Carolina Office; (3) falsify time records for the Company's Veterans Benefits Management System contract with the government; (4) intentionally submit false resumes to the government; (5) improperly expense costs; and (6) fail to take action in response to reports of improper conduct (collectively, the "Fraudulent Misconduct").

8.      The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

9.      Moreover, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or

---

[1] For purposes of this Complaint, the terms "Booz Allen" and the "Company" include Booz Allen Hamilton Inc.

omissions of material fact that failed to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.

10.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in lucrative insider sales, netting proceeds of over $10.9 million.  Over 2.2 million shares of the Company's common stock were repurchased between January and May 2017 for approximately $78 million.  As the Company stock was actually only worth $31.90 per share during that time, the Company overpaid over $7.8 million in total.

12.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its President and Chief Executive Officer ("CEO"), and its Executive Vice President, Chief Financial Officer ("CFO") and Treasurer to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the

"Securities Class Action"), the need to undertake internal investigations, losses due to the Company's overpayment of more than $7.8 million for the repurchases of its own stock and the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company, an investigation by the DOJ, and will cost the Company going forward many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and insider selling by three of them, including two of the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of them in the related Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the  Booz Allen Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Booz Allen common stock. Plaintiff has continuously held Booz Allen common stock at all relevant times.

### Nominal Defendant Booz Allen

20.     Nominal Defendant Booz Allen is a Delaware corporation with its principal executive offices at 8283 Greensboro Drive, McLean, Virginia 22102. Booz Allen stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BAH."

### Defendant Rozanski

21.     Defendant Horacio D. Rozanski ("Rozanski") has served as the Company's President and CEO since January 2015, and has served as a Company director since 2014. According to the Company's Schedule 14A filed with the SEC on June 21, 2017 (the "2017 Proxy Statement"), on June 8, 2017, Defendant Rozanski beneficially owned 767,484 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Rozanski owned about $29.9 million worth of Booz Allen stock.

22.     For the fiscal year ended March 31, 2017,[2] Defendant Rozanski received $3,016,832 in compensation from the Company.  This included $1,437,500 in salary, $546,468 in stock awards, and $846,555 in non-equity incentive plan compensation.

23.     The Company's 2017 Proxy Statement stated the following about Defendant Rozanski:

> Mr. Rozanski is our President and Chief Executive Officer and served as our Chief Operating Officer until January 1, 2015. Mr. Rozanski served as Chief Strategy and Talent Officer in 2010 and prior to that, Chief Personnel Officer of our Company from 2002 through 2010. Mr. Rozanski joined our Company in 1992 and became an Executive Vice President in 2009, our President on January 1, 2014, and our Chief Executive Officer on January 1, 2015. He serves on the board of trustees of the Jewish Primary Day School of the Nation's Capital and board of directors of The Center for Talent Innovation and the United States Holocaust Memorial Museum's Committee on Conscience.

24.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Rozanski made the following sale of Company stock (and made no purchases of Company stock).  On December 5, 2016, Defendant Rozanski sold 122,040 shares of Company stock for $37.57 per share, for which he received approximately $4.6 million.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**Defendant Howell**

25.     Defendant Lloyd W. Howell, Jr. ("Howell") has served as the Company's Executive Vice President, CFO and Treasurer since July 2016.  According to the Company's 2017 Proxy Statement, on June 8, 2017, Defendant Howell beneficially owned 342,364 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the

---

[2] The Company refers to the period of April 1, 2016 to March 31, 2017 as "fiscal 2017."

close of trading on June 8, 2017 was $38.91, Howell owned about $13.3 million worth of Booz Allen stock.

26.     For the fiscal year ended March 31, 2017, Defendant Howell received $2,292,869 in compensation from the Company.   This included $1,000,000 in salary, $380,141 in stock awards, and $587,004 in non-equity incentive plan compensation.

27.     The Company's website states the following about Defendant Howell:

Lloyd Howell Jr. is the firm's chief financial officer and treasurer. He is responsible for the firm's financial statements, capital structure, and related financial operations. He previously led the firm's Civil and Commercial business.

Lloyd joined Booz Allen in 1988 as a consultant and provided systems engineering support to multiple Department of Defense satellite programs. In 1991, he took a leave of absence from the firm to get an M.B.A. from Harvard University and worked at Goldman Sachs as an associate in their investment banking division from 1993 to 1995.

In 1995, Lloyd returned to Booz Allen where he became a member of the strategy and organization team focused on clients with the Navy/Marine Corps, Army, and Office of the Secretary of Defense. In 2000, he was elected vice president.

From 2009 to 2013, he served as the client service officer of the financial services account. Lloyd served on the firm's leadership team since 2007. From 2013 to 2016, Lloyd led our Civil and Commercial business, working on strategic, technology, and analytics projects.

Lloyd's federal clients included the U.S. Department of Treasury and its bureaus, Securities and Exchange Commission, Federal Reserve, Pension Benefit Guaranty Corporation, Commodity Futures Trade Commission, and commercial clients that included the top 50 global financial institutions and significant stock exchanges.

Lloyd's board memberships include Integra LifeSciences Corp., Partnership for Public Service (where he chairs the finance committee), Capital Partners for Education, Management Leadership for Tomorrow, Executive Leadership Council, Washington Economics Club, the University of Pennsylvania's Engineering School, and St. Albans School.

Lloyd holds a B.S. in electrical engineering from the University of Pennsylvania and an M.B.A. from Harvard University. He won Black Engineer of the Year Awards in 2010 and 2011.

28.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Howell made the following sales of Company stock (and made no purchases of Company stock).  On December 6, 2016, Defendant Howell sold 88,980 shares of Company stock for $37.79 per share.  On May 22, 2017, Defendant Howell sold 24,140 shares of Company stock for $38.51 per share.  On May 25, 2017, Defendant Howell sold 45,000 shares of Company stock for $39.01 per share.  Thus, in total, before the fraud was exposed, he sold 158,120 Company shares on inside information, for which he received approximately $6.0 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Cook**

29.     Defendant Kevin L. Cook ("Cook") served as the Company's CFO from July 2014 to July 2016, and served as Executive Vice President from April 2015 to July 2016.  According to the 2017 Proxy Statement, on June 8, 2017, Defendant Cook beneficially owned 8,781 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Cook owned about $341,668 worth of Booz Allen stock.

30.     For the fiscal year ended March 31, 2017, Defendant Cook received $722,135 in compensation from the Company.  This included $110,758 in salary, $175,996 in non-equity incentive plan compensation, and $430,381 in all other compensation.

31.     The Company's Form 10-K filed with the SEC on May 19, 2016 stated the following about Defendant Cook:

*Kevin L. Cook*[3] is an Executive Vice President and our Chief Financial Officer and Treasurer. Mr. Cook has previously announced his retirement from the positions of Chief Financial Officer and Treasurer effective July 1, 2016. He previously served as the company's Corporate Controller. Mr. Cook joined the company in 1986 as Manager, Project Cost Accounting. He left the company in 1996 to take on the role of Senior Vice President, Client Development for what is now JAMIS Software. Mr. Cook returned to Booz Allen in the spring of 2003 as Director, Financial Reporting Systems. In April of 2008, Mr. Cook was selected as the Corporate Controller for the company. Mr. Cook received his B.S. degree with a concentration in Accounting from Towson University in 1977, and an MBA with a concentration in Management in 1981 from the University of Baltimore. In 1982, he became a Certified Public Accountant (CPA) in the State of Maryland.

**Defendant Shrader**

32.    Defendant Ralph W. Shrader ("Shrader") has served as a Company director since 2008, and he serves as Chairman of the Board.  He previously served as the Company's CEO from 2008 to December 2014.  Defendant Shrader is also the Chair of the Executive Committee. According to the 2017 Proxy Statement, on June 8, 2017, Defendant Shrader beneficially owned 1,744,253 shares of the Company's common stock, which was about 1.2% of the Company's issued and outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Shrader owned about $67.9 million worth of Booz Allen stock.

33.    For the fiscal year ended March 31, 2017, Defendant Shrader received $410,013 in compensation from the Company.  This included $290,000 in fees earned and $120,013 in stock awards.

34.    The Company's 2017 Proxy Statement stated the following about Defendant Shrader:

Dr. Shrader is our Chairman and has served in this position since 2008. He previously served as our Chief Executive Officer from 2008 to December 31, 2014 and as our President from 2008 to December 31, 2013. He has also served as Chairman of Booz Allen Hamilton Inc. since 1999 and as Chief Executive Officer

---

[3] Emphasis contained in original throughout this Complaint, unless otherwise indicated.

of Booz Allen Hamilton Inc. from 1999 to December 31, 2014. Dr. Shrader has been an employee of our Company since 1974. He is the seventh chairman since our Company's founding in 1914 and has led our Company through a significant period of growth and strategic realignment. Dr. Shrader is active in professional and charitable organizations, and was previously Chairman of the Armed Forces Communications and Electronics Association.

35.     Defendant Shrader's son, Bryan E. Shrader, is a Vice President at the Company.

**Defendant Clare**

36.     Defendant Peter Clare ("Clare") has served as a Company director since 2008.  He is also Chair of the Nominating and Corporate Governance Committee, a member of the Executive Committee, and a member of the Compensation Committee.  According to the 2017 Proxy Statement, on June 8, 2017, Defendant Clare beneficially owned 3,424 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Clare owned about $133,227 worth of Booz Allen stock.

37.     For the fiscal year ended March 31, 2017, Defendant Clare received $57,781 in compensation from the Company.  This included $22,192 in fees earned and $29,589 in stock awards.

38.     The Company's 2017 Proxy Statement stated the following about Defendant Clare:

Mr. Clare is a Managing Director and Deputy Chief Investment Officer for Corporate Private Equity of The Carlyle Group, a private equity firm ("Carlyle"), as well as Co-Head of its U.S. Buyout Group. Mr. Clare has been with Carlyle since 1992. He serves on the board of directors of Signode Industrial since 2014. Mr. Clare served as a director of ARINC Incorporated from 2007 to 2013, CommScope, Inc. from 2011 to 2015, Pharmaceutical Product Development, LLC from 2011 to 2015, Sequa Corporation from 2007 to 2016, and Wesco Aircraft Holdings, Inc. from 2006 to 2012.

**Defendant Amble**

39.     Defendant Joan L. C. Amble ("Amble") has served as a Company director since 2012.  She is also a member of the Audit Committee.  According to the 2017 Proxy Statement, on

June 8, 2017, Defendant Amble beneficially owned 25,403 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Amble owned about $988,430 worth of Booz Allen stock.

40.     For the fiscal year ended March 31, 2017, Defendant Amble received $210,008 in compensation from the Company. This included $90,000 in fees earned and $120,008 in stock awards.

41.     The Company's 2017 Proxy Statement stated the following about Defendant Amble:

> Ms. Amble was the Executive Vice President, Finance for the American Express Company from May 2011 to December 2011, and also served as its Executive Vice President and Corporate Comptroller from December 2003 until May 2011. Prior to joining American Express, Ms. Amble served as Chief Operating Officer and Chief Financial Officer of GE Capital Markets, a service business within GE Capital Services, Inc., overseeing securitizations, debt placement, and syndication, as well as structured equity transactions. From 1994 to March 2003, Ms. Amble served as vice president and controller for GE Capital and GE Financial Services. Ms. Amble is the President of JCA Consulting, LLC, and serves on the boards of directors of Zurich Insurance Group since April 2015, XM Radio Inc. since 2006, and the merged Sirius XM Holdings Inc. since 2008. In addition, she serves as an independent advisor for risk and audit matters for the Societe General, N.A. board. Ms. Amble also served as a director at Brown-Forman Corporation from 2011 to 2016 and Broadcom Corporation from 2009 to 2011.

**Defendant Barnes**

42.     Defendant Melody C. Barnes ("Barnes") has served as a Company director since 2015. She is also a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. According to the 2017 Proxy Statement, on June 8, 2017, Defendant Barnes beneficially owned 6,778 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Barnes owned about $263,731 worth of Booz Allen stock.

43.     For the fiscal year ended March 31, 2017, Defendant Barnes received $210,008 in compensation from the Company.  This included $90,000 in fees earned and $120,008 in stock awards.

44.     The Company's 2017 Proxy Statement stated the following about Defendant Barnes:

> Ms. Barnes is the Co-Founder and Principal of MB Squared Solutions, LLC, a domestic policy strategy firm, a senior fellow in presidential studies at the University of Virginia's Miller Center and Chair of the Aspen Institute Forum for Community Solutions. Ms. Barnes currently serves as a director of Ventas Inc., a real estate investment trust. From January 2009 to January 2012, Ms. Barnes served in the White House as Director of the Domestic Policy Council. In this role, she provided policy and strategic advice to President Barack Obama and coordinated the domestic policy-making process for his administration. Before joining the White House, she served as the Senior Domestic Policy Advisor for then-Senator Obama's 2008 presidential campaign. Ms. Barnes was the Executive Vice President for Policy at the Center for American Progress from 2005 to 2008 and a Senior Fellow there from 2003 to 2005, and prior to that she was a principal in the Raben Group LLC. She also served as Chief Counsel to Senator Edward M. Kennedy on the Senate Judiciary Committee from 1998 to 2003 and General Counsel for him from 1995 to 1998. Ms. Barnes also serves on the non-profit boards of directors of Year-Up and the Marguerite Casey Foundation.

**Defendant Fujiyama**

45.     Defendant Ian Fujiyama ("Fujiyama") has served as a Company director since 2008.  He is also a member of the Executive Committee and a member of the Compensation Committee.  According to the 2017 Proxy Statement, on June 8, 2017, Defendant Fujiyama beneficially owned 3,424 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Fujiyama owned about $133,227 worth of Booz Allen stock.

46.     For the fiscal year ended March 31, 2017, Defendant Fujiyama received $51,781 in compensation from the Company.  This included $22,192 in fees earned and $29,589 in stock awards.

47.     The Company's 2017 Proxy Statement stated the following about Defendant Fujiyama:

> Mr. Fujiyama is a Managing Director of Carlyle, as well as a member of the firm's Aerospace, Defense, and Government Services team. In 1999, Mr. Fujiyama spent two years in Hong Kong and Seoul working with Carlyle's Asia buyout fund, Carlyle Asia Partners. He currently serves as a member of the board of directors of Dynamic Precision Group and Novetta Solutions LLC. He served on the board of directors of ARINC Incorporated from 2007 to 2013.

**Defendant Gaumond**

48.     Defendant Mark E. Gaumond ("Gaumond") has served as a Company director since 2011.  He is also Chair of the Audit Committee.  According to the 2017 Proxy Statement, on June 8, 2017, Defendant Gaumond beneficially owned 38,378 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Gaumond owned about $1.5 million worth of Booz Allen stock.

49.     For the fiscal year ended March 31, 2017, Defendant Gaumond received $240,001 in compensation from the Company.  This included $120,000 in fees earned and $120,001 in stock awards.

50.     The Company's 2017 Proxy Statement stated the following about Defendant Gaumond:

> Mr. Gaumond has 35 years of experience working with senior management and audit committees of public and privately-held companies. He held senior positions with E&Y from 2002 to 2010, retiring from the firm as Senior Vice Chair for the Americas, and previously was a partner with a 27-year career at Andersen LLP. Mr. Gaumond has a BA from Georgetown University and an MBA from New York University. He is a member of the American Institute of Certified Public Accountants. He has served as a director of First American Funds since 2016, Rayonier Advanced Materials, Inc. since 2014, both the Fishers Island Development Corporation and the Walsh Park Benevolent Corporation since 1992, and on the advisory board of BPV Capital Management LLC since 2011. Mr. Gaumond formerly served as a director of Cliff's Natural Resources, Inc. from July 2013 to September 2014, Rayonier, Inc. from November 2010 to June 2014, and is a former trustee of The California Academy of Sciences.

**Defendant McClain**

51.     Defendant Gretchen W. McClain ("McClain") has served as a Company director since 2014.   She is also a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.   According to the 2017 Proxy Statement, on June 8, 2017, Defendant McClain beneficially owned 18,682 shares of the Company's common stock.   Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, McClain owned about $726,916 worth of Booz Allen stock.

52.     For the fiscal year ended March 31, 2017, Defendant McClain received $210,013 in compensation from the Company.   This included $90,000 in fees earned and $120,013 in stock awards.

53.     The Company's 2017 Proxy Statement stated the following about Defendant McClain:

> Ms. McClain was the founding President and Chief Executive Officer of Xylem, Inc. ("Xylem") from October 2011 to September 2013. She joined Xylem as the founding CEO in 2011 when it was formed and taken public from a spinoff of the water business of ITT Corporation ("ITT"). She joined ITT in 2005 as the President of the company's residential and commercial water business and served as the SVP and President of ITT's commercial businesses from 2008 to 2011. Ms. McClain has served in a number of senior executive positions at Honeywell Aerospace (formerly AlliedSignal), including VP and General Manager of the Business, General Aviation and Helicopters Electronics division, and VP for Engineering and Technology, as well as for Program Management in Honeywell Aerospace's Engines, Systems and Services Division. She also spent nine years with NASA and served as Deputy Associate Administrator for Space Development, where she played a pivotal role in the successful development and launch of the International Space Station Program as Chief Director of the Space Station and Deputy Director for Space Flight. Ms. McClain graduated from the University of Utah with a BS in Mechanical Engineering. She currently serves as a director of Ametek, Inc., Boart Longyear Limited, and J.M. Huber Corporation (a family-owned business), and previously served as a director of Xylem from 2011 to 2013 and Con-Way Inc. from June 2015 to October 2015.

**Defendant Odeen**

54.     Defendant Philip A. Odeen ("Odeen") has served as a Company director since 2008.  He is also Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.  According to the 2017 Proxy Statement, on June 8, 2017, Defendant Odeen beneficially owned 42,585 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Odeen owned about $1.7 million worth of Booz Allen stock.

55.     For the fiscal year ended March 31, 2017, Defendant Odeen received $225,007 in compensation from the Company.  This included $105,000 in fees earned and $120,007 in stock awards.

56.     The Company's 2017 Proxy Statement stated the following about Defendant Odeen:

> Mr. Odeen served as the chairman of the board of directors and lead independent director of AES Corporation from 2009 to 2013, and as a director of AES from 2003 to 2013. Mr. Odeen also served as the chairman of the board of Convergys Corporation ("Convergys") from 2008 to 2013, and as a director of Convergys from 2000 to 2013, QinetiQ North America, Inc., from 2006 to 2014, and ASC Signal Corporation, from 2009 to 2015. He has served as a director of Globant S.A. and DRS since 2013. Mr. Odeen retired as Chairman/Chief Executive Officer of TRW Inc. in December 2002. Mr. Odeen has provided leadership and guidance to our Board as a result of his varied global business, governmental, and non-profit and charitable organizational experience of over 40 years.

57.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Odeen made the following sale of Company stock (and made no purchases of Company stock).  On February 8, 2017, Defendant Odeen sold 10,000 shares of Company stock for $34.06 per share, for which he received $340,600.  His insider sale, made with knowledge of material non-public information

before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**Defendant Rossotti**

58.     Defendant Charles O. Rossotti ("Rossotti") has served as a Company director since 2008.  He is also a member of the Audit Committee.  According to the 2017 Proxy Statement, on June 8, 2017, Defendant Rossotti beneficially owned 116,348 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Rossotti owned about $4.5 million worth of Booz Allen stock.

59.     For the fiscal year ended March 31, 2017, Defendant Rossotti received $210,008 in compensation from the Company.  This included $90,000 in fees earned and $120,008 in stock awards.

60.     The Company's 2017 Proxy Statement stated the following about Defendant Rossotti:

> Mr. Rossotti has served as a Senior Advisor to Carlyle since June 2003. Prior to this position Mr. Rossotti served as the Commissioner of the Internal Revenue Service from 1997 to 2002. Mr. Rossotti co-founded American Management Systems, Inc., an international business and information technology consulting firm in 1970, where he served at various times as President, Chief Executive Officer and Chairman of the Board until 1997. Mr. Rossotti serves as a director for the AES Corporation since 2003 and as its Chairman since 2013, ECi Software Solutions, since 2014, Coalfire Systems Inc. since September 2015, and Novetta Solutions LLC since March 2016. Mr. Rossotti formerly served as a director of Bank of America Corporation from 2009 to May 2013, Compusearch Software Systems from 2005 to 2010, Wall Street Institute from 2005 to 2010, Apollo Global from 2006 to 2012, Quorum Management Solutions from 2010 to 2014, and Primatics Financial from 2011 to 2015, and as a trustee of Carlyle Select Trust from March 2014 to April 2015.

**Defendant Johnson**

61.     Defendant Arthur E. Johnson ("Johnson") has served as a Company director since 2011.  He is also a member of the Audit Committee.  According to the 2017 Proxy Statement, on

June 8, 2017, Defendant Johnson beneficially owned 20,847 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 8, 2017 was $38.91, Johnson owned about $811,157 worth of Booz Allen stock.

62.     For the fiscal year ended March 31, 2017, Defendant Johnson received $210,013 in compensation from the Company. This included $90,000 in fees earned and $120,013 in stock awards.

63.     The Company's 2017 Proxy Statement stated the following about Defendant Johnson:

> Mr. Johnson retired as Senior Vice President, Corporate Strategic Development of Lockheed Martin Corp. ("Lockheed Martin") in 2009, a position he held since 1999. Mr. Johnson has over 20 years of senior leadership experience in the information technology and defense businesses. Mr. Johnson brings extensive IT management experience to the Board, having held senior positions at IBM, Loral Corporation, and Lockheed Martin. He serves on the board of directors of Eaton Corporation, plc since 2009, and as an independent trustee of the Fixed Income and Asset Allocation funds of Fidelity Investments since 2008. Mr. Johnson served as a director of Delta Airlines from 2005 to 2007, and IKON Office Solutions Corporation from 1999 to 2008.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.     By reason of their positions as officers, directors and/or fiduciaries of Booz Allen and because of their ability to control the business and corporate affairs of Booz Allen, the Individual Defendants owed Booz Allen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Booz Allen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Booz Allen and its shareholders so as to benefit all shareholders equally.

65.     Each director and officer of the Company owes to Booz Allen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Booz Allen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of Booz Allen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Booz Allen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Booz Allen's Board at all relevant times.

69.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. They also had a duty not to engage in the Fraudulent Misconduct.

70.     To discharge their duties, the officers and directors of Booz Allen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Booz Allen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Booz Allen's own internal guidelines, including its Code of Business Ethics and Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Booz Allen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Booz Allen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Booz Allen's operations would comply with all laws and Booz Allen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

71.     Each of the Individual Defendants further owed to Booz Allen and the shareholders the duty of loyalty requiring that each favor Booz Allen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Booz Allen and were at all times acting within the course and scope of such agency.

73.     Because of their advisory, executive, managerial, and directorial positions with Booz Allen, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Booz Allen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) to engage in the Fraudulent Misconduct; (iii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iv) to artificially inflate the Company's stock price.

77.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Booz Allen was a direct, necessary, and substantial

participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Booz Allen, and was at all times acting within the course and scope of such agency.

## BOOZ ALLEN'S CODES OF ETHICS

80.     Pursuant to the Company's Code of Business Ethics and Conduct (the "Code of Ethics"), the Code of Ethics "applies to all employees, officers, directors, contractors, consultants, and others working on our behalf."

81.     The Code of Ethics provides, in the section beginning with "We Live Our Values Every Day," that:

> And while we comply with all applicable laws – this is true wherever we work around the world – complying with the law is just the beginning.  We also demand that our actions, and those of our colleagues and others we do business with, reflect our values, even when it's difficult.

82.     The Code of Ethics provides, in the section beginning with "We Maintain Accurate Records," that:

> We maintain accurate records in the appropriate location and for the required length of time in accordance with contract terms and applicable laws.  We never

misrepresent, falsify, or alter data, or destroy any documents or other information that is the subject of any investigation.

* * *

Reliable business records enables us to comply with all laws and regulations, and make informed business decisions for the benefit of the company, our shareholders, and our clients.

* * *

We have policies, procedures, and controls that govern our information creation, handling, access, security, and disposition practices. We disclose complete, fair, accurate, timely, and understandable information to regulators, auditors and the public.

83.    The Code of Ethics provides, in the section beginning with "We Do Not Engage in

Insider Trading," that:

We do not, directly or indirectly, purchase or sell securities of the firm or its affiliates, or any other company, while in possession of material non-public information concerning the firm or any other company.

* * *

Complying with the laws and regulations regarding the trading of securities promotes a fair and open market for not only our people and our shareholders, but for market participants as a whole. Our compliance with these laws is not only mandatory but critical in our role as a publicly traded company.

* * *

We provide all current and prospective investors equal access to material information concerning our business and financial performance. We do not trade securities during periods when trading is restricted.

84.    The Individual Defendants violated the Code of Ethics by making and/or causing

the Company to make the false and misleading statements and/or omissions discussed herein and

to violate applicable laws and regulations. Moreover, three of the Individual Defendants violated

the Code of Ethics by engaging in insider trading.

85.     Pursuant to the Company's Code of Ethics for Senior Financial Officers (the "Financial Officer Code of Ethics"), the Company's Senior Financial Officers (the CEO, CFO, Chief Administrative Officer, Controller, and any other persons performing similar or related functions) are required to comply with the Financial Officer Code of Ethics.

86.     The Financial Officer Code of Ethics provides, as to "Compliance with Law," that:

Each Senior Financial Officer shall comply with all applicable laws, rules and regulations of federal, state and local governments and other private and public regulatory agencies that affect the Company' business and its conduct in business matters and the Company's financial reporting.

Each Senior Financial Officer shall promptly notify the General Counsel, the Disclosure Committee or the Audit Committee of any suspected violations of laws, rules or regulations applicable to the Company or the operation of its business, by the Company or any employee or agent thereof.

87.     Defendants Rozanski, Howell, and Cook violated the Financial Officer Code of Ethics by causing the Company to violate applicable laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

88.     In May 2008, Booz Allen was incorporated to serve as the holding company for the Company's U.S. government consulting business.

89.     Booz Allen's primary client is the U.S. government, which accounted for 97% of the Company's revenues in both fiscal 2016 and 2017.  Such revenues were generated from task orders and contracts, with the Company serving either as prime or sub-contractor.  The U.S. Army was the largest single entity that the Company served in its fiscal 2017, and represented approximately 14% of the Company's revenue during that fiscal year.

90.     The Company is specifically dependent on its defense contracts, with its primary defense clientele including the Air Force, Army, Joint Combatant Commands, Navy Corps, and

Marine Corps.  Foreign military sales to non-U.S. government clients is also included in the revenue generated by the Company from its defense clients.  In fiscal 2017, the Company generated $2.7 billion in revenue from its defense clients, which was approximately 46.6% of the Company's fiscal 2017 revenue.  In fiscal 2016, the Company generated $2.6 billion in revenue from its defense clients, which was approximately 48.3% of the Company's fiscal 2016 revenue.

91.    The Company also derives a significant portion of its revenue from its intelligence clients, with such work generating $1.3 billion in fiscal 2017 and $1.3 billion in fiscal 2016 in revenue for the Company.  These amounts, respectively, were approximately 23.1% of the Company's revenue in fiscal 2017 and approximately 23.4% of the Company's revenue in fiscal 2016.  The Company's primary intelligence clients include the National Security Agency, the National Reconnaissance Office, the National Geospatial-Intelligence Agency, the Service Intelligence Centers, and the Defense Intelligence Agency.

92.    The Company, as a government contractor, derives revenue from three different contract structures: cost-reimbursable, time and materials, and fixed price.

93.    Under a cost-reimbursable contract, the Company receives payment of allowable costs incurred during performance of a contract, up to a limit based on the amount that has been funded, plus a fee that is either capped or determinable based on predetermined performance criteria.

94.    Time and materials contracts provide for the Company to be paid a fixed hourly rate for each direct hour of labor expended and reimbursed for billable material costs and out-of-pocket expenses inclusive of allocable indirect costs.

95.     In fixed price contracts, the Company performs work for a pre-specified price, but such contracts also allow for the Company to earn incentive payments or incur penalties based on the performance of the Company.

96.     The Company is subject to several laws and regulations as a U.S. government contractor, and violation of these laws and regulations may result in civil penalties, criminal penalties, suspension from contracting with federal agencies, a complete bar from contracting with federal agencies, or termination of government contracts.

97.     Strict accounting rules are applied to government contractors such as Booz Allen, and these government contractors must annually submit cost reports to federal auditors.  Any disputes over costs typically do not rise to the level that requires an investigation by the DOJ.  Per government regulations, the Pentagon may withhold payments to a government contractor if it is discovered that it is involved in financial irregularities.

**A History of Fraud**

98.     The Company has a history of fraudulent conduct, including accounting and cost-charging impropriety, that put or should have put the Individual Defendants on notice of the Fraudulent Misconduct, if not for their reckless or willful lack of oversight.

99.     A 2006 investigation conducted by the DOJ determined that the Company had submitted false claims for travel reimbursement to the government that violated regulations concerning federal contracting.  The Company specifically obtained rebates on travel expenses but did not report them to government clients.   Moreover, the Company did not lower their reimbursement claims by the rebate amounts.   The Company agreed to pay a $3.37 million settlement to settle the matter, but the DOJ initially recommended that the Company be barred from federal contracting due to their violations.  The Individual Defendants who served as officers

or directors at that time thus were at least aware that violations of federal contracting regulations could result in a complete bar from government contracting, which would have a devastating effect on the Company's business.

100.    On May 29, 2009, the Company settled a case brought by the U.S. Attorney's Office, Eastern District of Virginia, regarding allegations from an anonymous NASA contract specialist who alleged that the Company was billing for employees at higher job categories than what was justified based on their experience, submitting excessive billing at its off-site rate, and inflating its monthly hours.

101.    In February 2012, the Company's San Antonio, Texas office was temporarily suspended from bidding on government contracts because the U.S. Air Force determined that in 2011, a senior associate at the Company's San Antonio Office who was also a retired Air Force Lieutenant Colonel, had shared non-public, protected information with colleagues concerning an information technology support services contract that would have given the Company an unfair competitive advantage in obtaining a contract.  Following the Air Force's proposed disbarment actions that followed, an investigation was conducted that revealed "other instances of improper conduct by [Booz Allen] personnel, including additional improper actions to capture the follow-on Air Force contract in question, as well as improper actions concerning other government contract capture efforts at Booz Allen locations beyond San Antonio."  The improper conduct uncovered included that "Booz Allen personnel have improperly obtained, handled, and used non-public information, including information that may be characterized as source-selection information, bid or proposal information, and/or competitor proprietary information," and that "Booz Allen personnel, in some instances, were aware of their colleagues' improper conduct and chose not to report such improper conduct."  The Company conducted an internal ethics review

and produced an initial report stating that "Booz Allen's ethics message may not be inculcated throughout the firm and specifically, beyond its headquarters location." The Air Force's allegations resulted in the Company agreeing to pay the Air Force $65,000.

102.  On April 13, 2012, the Company resolved the allegations made by the Air Force by entering into a three-year agreement whereby the Company admitted that "the proposed debarment and its resulting investigation have revealed ethical deficiencies and questionable business practices that may be systemic in nature." The agreement also required the Company, beginning in June 2012 and continuing quarterly thereafter, to provide the Air Force with a report regarding Booz Allen's implementation of ethical remedial measures in response to the agreement. Such reports include information concerning the status of all government and internal investigations regarding procurement-related matters and all allegations of integrity-related or business ethics misconduct that are initiated, pending, or resolved following the Company's previous report. Following the recommendation by an independent firm hired to review the Air Force incident to form an ethics program, the Company formed its Ethics Office in 2012.

103.  On March 31, 2015, the Intelligence Community Inspector General ("ICIG") stated that the ICIG had determined that the Company's employees had engaged in contractor employee attendance and time fraud due to being absent from their assigned worksites for the full period billed to a contract. Specifically, the ICIG found that a Company employee with a billing rate of $87.04/hour falsely charged approximately 123.5 hours from October 2013 to September 2014 at a total cost of approximately $10,706. Moreover, the ICIG found that a Company team leader with a billing rate of $116.61/hour falsely charged approximately 304.5 hours from October 2013 to July 2014 at a total cost of approximately $35,508.

### The Fraudulent Misconduct

104.    The Individual Defendants caused Booz Allen to engage in a series of misconduct that has either subjected the Company to penalties or caused the Company to be threatened by penalties, which put the Individual Defendants on notice of violations at the Company and the likelihood of future violations, including those currently being investigated by the DOJ, and that such violations would jeopardize the Company's future revenue.

### *DCAA Audits*

105.    The Defense Contract Audit Agency ("DCAA") performs all contract audits for the Department of Defense.  According to former employee FE1,[4] who worked in the Company's regulatory compliance group from 2002 to 2012 and assisted with the creation of the Company's Ethics Office from 2012 until November 2014, the DCAA was able to double a prior year's fine against a contractor if errors that the contractor had made were not corrected.  Additionally, the DCAA had the ability to triple a fine if a contractor failed to bill costs properly for a third year.  FE1 knew that the DCAA had issued fines against the Company regarding "unallowables."

106.    FE2[5] stated that random audits of the Company's costs were conducted by the DCAA to determine whether the Company was charging accurate rates for allowable expenses to the government.  FE2 confirmed that the Company was fined by the DCAA for expensing "unallowables" under its contracts with the government.  These fines exceeded $1 million.  FE2 notes that in 2012, the Company was told by the DCAA that the DCAA was removing improper charges filed by the Company, and the DCAA instructed the Company to prevent future

---

[4] Anonymous witnesses are identified herein with the designation "FE1," "FE2," etc., and all such or otherwise references to anonymous witnesses or employees are drawn from the Amended Complaint for Violations of the Federal Securities Laws filed in the Securities Class Action on October 20, 2017, which is attached as Exhibit A hereto, and correspond to the same referenced witnesses as contained therein.

[5] FE2 served as a senior manager in the Company's Planning Reporting and Analysis ("PR&A") department until February 2013.  PR&A reported to the CFO and was a part of the Company's finance group.  FE2 reported to a PR&A director, who reported to the CFO, and was head of PR&A for the defense business unit.

unallowable charges from occurring.  FE2 recalls that the Company, despite being warned by the

DCAA, was again fined for unallowables in 2013, and that the unallowable charges were not tied

to just one contract, but were "general."

107.    DCAA audit reports reveal that the DCAA's audits often discovered deficiencies

at the Company, including:

- The Company's "indirect and other direct cost system and related internal control policies and procedures are inadequate" (DCAA Audit Report No. 6151-2006Q14980001, dated January 29, 2007).
- The Company's control environment and overall accounting control system was "inadequate in part" (DCAA Audit Report No. 6151-2007Q11070001, dated September 11, 2007).
- The Company "did not estimate costs in the same manner as it accumulates costs, did not present its own material handling costs separate from the proposed subsidiary costs, and did not follow its policies and procedures for escalating costs. . . ." (DCAA Audit Report No. 6151-2010Q24010001, dated November 17, 2010).
- The Company's IT system general internal controls are inadequate (DCAA Audit Report No. 6151-2009R11510006, dated January 20, 2012).

### NSF Requested Audits

108.    The National Science Foundation ("NSF") requested the Assistant Inspector

General for Audit, in connection with the DCAA, to audit the Company for costs incurred from

two contracts during the fiscal year 2008.  The audits revealed control deficiencies and improper

cost accounting.  The February 19, 2016 NSF OIG Report No. 16-1-005, which is publicly-

available, revealed "$466,446 of questioned costs on the two NSF contracts, comprised of

[redacted] questioned direct costs and $[redacted] in questioned indirect costs."  Moreover, the

report recommended that the NSF "[w]ork with the DoD cognizant audit officials to assure that

any additional corrective actions applicable to NSF are taken," and that the NSF "[r]esolve the

$466,446 of NSF questioned contract costs" on the two contracts.

109.    The NSF OIG Audit Report No. OIG-16-1-008 also dated February 19, 2016 and

also concerning an audit of costs incurred by the Company in fiscal year 2008, disclosed

"significant deficiencies that [the DCAA] considered to be material weaknesses in the design or operation of the IT system general internal controls that [the DCAA] believed could adversely affect [the Company]'s ability to initiate, authorize, record, process, and/or report costs in a manner that is consistent with applicable government contract laws and regulations."  The report noted that the Company "concurred with the deficiencies cited in the report and submitted a corrective action plan that proposes to correct the significant deficiencies."

110.    In a third report dated February 19, 2016, the NSF OIG Audit Report No. OIG-16-1-011, which also concerned an audit of costs incurred by the Company in fiscal 2008, it was stated that the "DCAA determined that [the Company]'s practice for accounting for Defense Base Act (DBA) Insurance costs in two fringe pools was not compliant because in doing so, the DVA insurance costs are allocated to all cost objectives, many of which do not require DVA insurance and do not benefit from the cost."  Moreover, the report stated that "DCAA recommended that [the Company] revise its accounting policies and disclosure statement to remove the DBA insurance costs from the two fringe pools and assign them directly to the contracts that require the insurance."

111.    A fourth report dated March 31, 2016, NSF OIG Audit Report No. 16-1-013, regarding an audit of incurred costs in fiscal year 2009, questioned $1.2 million of indirect costs on the $30.3 million of claimed costs on three contracts with the NSF.  The report noted that the "DCAA issued an adverse opinion on the entire [Booz Allen] proposal for claimed costs."

### *Fraud at the Company's Charleston Office*

112.    FE3 was a project analyst in the Company's North Charleston, South Carolina office from March 2015 to February 2016.  While serving in this role, FE3 worked on the Company's Veterans Benefits Management System ("VBMS") contract[6] with the government.

---

[6] The Company announced in May 2016 that it was "Selected to Help Advance Department of Veteran Affairs through $22.3 Billion total IT Service Solutions and Modernizations Program," and that the contract was in support of

Part of FE3's duties were to on-board new employees at the North Charleston office and process their security clearances through the U.S. government.   At the time, FE3 estimated that the Company employed over 100 employees in its North Charleston office.   The employees in the Company's North Charleston home office worked on several contracts for the Department of Defense, which included U.S. Navy and Army contracts.

113.    FE3 was additionally responsible for processing security clearances for employees of SPARC, a Charleston, South Carolina-based technology firm and former Company subcontractor on the VBMS contract.  The Company acquired SPARC's software services unit, its assets, about 270 staff members providing software development services for the U.S. Department of Veterans Affairs ("VA"), and additional private and public sector clients on or around November 2, 2015 for $53 million.

114.    FE3 was assigned to work on the Company's VBMS contract which involved the transition of the VA's claims processing system to a paperless system through software development.

### Falsified Time Records for the VBMS Contract

115.    Supervisors at the North Charleston office, per FE3, told all employees and contractors to enter on their timesheets at least eight hours per day, regardless of whether they worked less than eight hours, because as stated by FE3's supervisor the Company would lose money from the government if it did not claim all hours available under the VBMS contract. According to FE3, a Booz Allen program manager named Elizabeth Kralik ("Kralik"), who worked in Charleston since October 2011, told new Company hires and new SPARC hires to bill eight hours per day even if the employee had not actually worked eight hours.  A Project

---

initiatives under a 10-year program.

Integration Manager at the Company named Elizabeth Mills was "right there," per FE3, when SPARC employees were instructed to enter inflated hours on their timesheets. FE3's timesheet was not approved by a supervisor in at least one instance because FE3 did not enter enough time on the VBMS contract to be billed, and FE3 was directed to modify FE3's timesheets to bill more time to the contract.

### False Resumes Intentionally Submitted to the Government by Managers

116. FE3's employee onboarding duties involved the submission of documents to the government for SPARC employees to obtain clearance to work on contracts for the government. In fulfilling FE3's responsibilities, FE3 discovered errors on the resumes of employees and in fact recalls confirming with employees that their resumes had incorrect information. Thus, FE3 knew that employees who did not have proper clearance were working on the VBMS contract. Per FE3's estimates, at least 10 to 15 SPARC employees working on the VBMS project did not have proper clearance, in direct violation of the requirements of the VBMS contract.

117. FE3 states that in one instance, Kralik changed an employee's resume to include a promotion that had not occurred, ultimately resulting in the employee being billed at a higher paygrade to the government.

118. In another instance, FE3 states that a resume was brought to FE3's attention by a government employee because the resume as submitted by the Company to the government was different from a resume previously on file for the same individual. Per FE3, Kralik changed Company employees' resumes while others at SPARC modified SPARC resumes.

### Fraudulent Expensing

119. As the Company's VBMS contract was a fixed price contract, the Company would be paid a single price by the government for its work. Moreover, the price would not be adjusted by the government and the expectation was that the Company would complete the necessary work

for the price agreed to.  However, as noted by FE3, there were cost overruns for the VBMS contract and this "was costing [Booz Allen] money."  The Company nonetheless had the opportunity to create additional revenue when the Company's was asked by the government to modify the contract, according to FE3.  The Company then modified the resumes of employees to increase reimbursement rates and provided employees that lacked proper skill sets.

120.    In a specific instance of improper cost expensing, FE3 states that a senior consultant at the Company named Patricia Hulteen ("Hulteen") wanted to purchase for $5,000 a software license that would be expensed to the VBMS contract, and a Chief Technologist at the Company named Ron Berry asked Hulteen to state to the government that the cost of the software license was $100,000, so that more money could be obtained from the government.

### Failure to Adequately Respond to Reports of Improper Conduct

121.    In July or August 2015, FE3 reported to Bruce Thackston, ethics advisor for the North Charleston office, all of the improper conduct that FE3 had observed at the Company.

122.    FE3 also informed John Peterson ("Peterson"), a Vice President at the Company, that Kralik had directed Company employees to always enter having worked eight hours a day, even if eight hours had not been worked by the employee that day.  FE3 also informed Peterson of other "unethical behavior," as discussed herein.

123.    In FE3's meeting with Peterson, however, FE3 was notified that the purpose of the meeting was to discuss "what [FE3] had done."  FE3 realized, based on Peterson's comments, that Peterson had flown in from Company headquarters to fire FE3.

### Materially False and Misleading Statements

124.    The Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations,

prospects, and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make the following false and misleading statements that failed to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.

### May 18, 2016 Press Release

125.    On May 18, 2016, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended March 31, 2016, noting, among other things, "Full-year Revenue of $5.41 billion," "Full-year Adjusted Diluted Earnings per Share of $1.65," and that the Company "projects continued revenue growth in fiscal 2017."

### May 18, 2016 Earnings Call

126.    Also on May 18, 2016, the Company held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended March 31, 2016, where Defendant Cook touted the Company's prospects, including its "sustainable quality growth," stating, in relevant part:

> As we've noted throughout the year, FY 2016 represented Booz Allen's pivot toward growth. Over the course of the year we talked about it as an inflection point for the firm. A year that presented significant opportunities and an improved market. We turn the end of our largest IDIQ contract into a significant good news story by not only replacing but upsizing the ceiling associated with the replacement contracts and task orders.
>
> We leaned forward by investing in growth and achieved our best fourth quarter book-to-bill in five years, our best whole year book-to-bill since our IPO and our largest year-end backlog ever. We are also very proud to have exceeded the revenue range and met the ADEPS guidance we provided last year at this time.
>
> Our results affirmed that we have the right strategy for the future. And fiscal 2016 marked the turning point on the path of sustainable quality growth. I know you have

all reviewed the earnings release issued this morning. I'd like to provide a little color behind the results detailed there.

First, when you look at the backlog, the type of work we're winning matters as much as the quantity. In FY 2016, we had a lot of success selling work that advances our Vision 2020 strategic objectives. It is aligned to clients' core missions and includes more technical content. While year-over-year funded backlog is flat, unfunded backlog in priced options are up 20% and 45% respectively, which gives us confidence about accelerating growth.[7]

127.    During the earnings call, Defendant Howell had the following exchange with an analyst discussing the increase in billable expenses that the Company experienced during the fiscal year 2016:

[Amit Singh, Analyst, Jeffries LLC]

And just on one of your earlier comments, Lloyd, about spending will subside a little in fiscal 2017 versus fiscal 2016. So, as you look at your set of margins in 2017, should we expect them to come closer to the 2015 level?

[Defendant Howell]

We have seen continued growth or continued strength in our contract profitability and length. And though we spend aggressively in FY 2016 to capture and record that level of backlog, we're going to work to control that spending. Our available expenses were higher in 2016, and we expect the slight continued increase in 2017. But we don't see that impacting our margins negatively.

We'll continue to lean into the market, and we believe we can become more efficient as you heard from Horacio. So, our reduced spending, our higher billability are expected to support adjusted EBITDA margins trending back upward with a relatively flat profile quarter-to-quarter.

128.    Defendant Cook also noted during the earnings call that billable expenses contributed to the Company's growth in revenue, stating, in relevant part:

Second, a point about billable expenses. Billable expenses contributed to our revenue growth and applied modest pressure on adjusted operating income, adjusted EBITDA and adjusted net income. The FY 2016 uptake in billable expense was due in part to an increase in federal agency small business goals which led to greater use of subcontractors.

---

[7] Earnings call transcripts obtained from *SeekingAlpha.com*.

This increase in subcontractor cost accounted for approximately 20% of the annual adjusted EBITDA margin decline. Another driver of our results was indirect spending, which Horacio mentioned and we've discussed over the course of the year.

[Hiring] [ph] direct spending adds to the top line as a result of revenue recognition on cost-reimbursible contracts. At the same time, it negatively affects adjusted operating income, adjusted EBITDA, net income, and cash.

129.    Additionally, Defendant Cook had the following exchange with an analyst discussing Booz Allen's substantial increase in billable expenses in the fiscal year 2017:

[Cai von Rumohr, Analyst, Cowen and Company]

Yes. Thank you very much. So, billable expenses were considerably up in the fourth quarter as a percent of sales. Maybe tell us as you look at fiscal 2017, what is your assumption about billable expenses and give us some color as to why you're assuming what you're assuming?

[Defendant Cook]

Hi, Cai, it's Kevin. You're right. What's up in the fourth quarter? And actually up for the entire year substantially. Well, that's driven by the – some of the changes in the small business subcontract that we are required to do. We don't expect to see that type of step function increase again in FY 2017. So, the good news there is that it shouldn't have any downward pressure, material downward pressure on our adjusted EBITDA margins.

And to put it on context, the billable expenses, I think, in FY 2015 were about 26.6% of revenue and they're about 28% FY 2016. It is on some of the larger procurements with [indiscernible] partners and things like that. We're delivering solutions that will be probably at consistent level of subcontractors going forward. But again, nothing – we don't expect to see another spike.

***May 19, 2016 Form 10-K***

130.    On May 19, 2016, the Company filed with the SEC its annual report for the quarter and year ended March 31, 2016 on a Form 10-K signed by Defendants Rozanski, Shrader, Amble, Barnes, Clare, Fujiyama, Gaumond, Johnson, McClain, Odeen, and Rossotti (the "2015/16 10-K").  The 2015/16 10-K announced the Company's operating and financial results for the quarter, reporting revenue of $1.42 billion and net income of $65.52 million, or $0.43 per diluted share, compared to revenue of $1.34 billion and net income of $43.36 million, or $0.29 per diluted share,

for the same fiscal period in the prior year.  For the year, the 2015/16 10-K reported revenue of $5.41 billion and net income of $294.09 million, or $1.94 per diluted share, compared to revenue of $5.27 billion and net income of $232.57 million, or $1.52 per diluted share, for the prior fiscal year.

131.   The 2015/16 10-K commented on the importance of the Company's business with the U.S government, stating, in relevant part:

> Through our dedication to our clients' missions, and a commitment to evolving our business to address client needs, we have longstanding and deep relationships with our clients -- some more than 75 years. We support critical missions for a diverse base of federal government clients, including nearly all of the U.S. government's cabinet-level departments, and federal contract vehicles, as well as increasingly for top-tier commercial and international clients. We support these clients by addressing complex and pressing challenges such as combating global terrorism, improving cyber capabilities, transforming the healthcare system, improving efficiency and managing change within the government.

> * * *

> Through our commitment to client success, we have fostered strong client relationships with a diverse client base of government, commercial, and international clients. We believe that the U.S. government is the world's largest consumer of management and technology consulting services. The U.S. government's budget for the fiscal year ended September 30, 2015 was close to $3.9 trillion, excluding authorizations from Overseas Contingency Operations and supplemental funding for the Department of Defense. Of this amount, approximately $1.1 trillion was for discretionary budget authority, including $623 billion for the Department of Defense and Intelligence Community and $563 billion for civil agencies. Based on data from the Federal Procurement Data System, approximately $438 billion of the U.S. government's fiscal year 2015 discretionary outlays were non-intelligence agency funding-related products and services procured from private contractors. We estimate that $112 billion of the spending directed towards private contractors in U.S. government fiscal year 2015 was for management, technology, and engineering services, with $63.3 billion spent by the Department of Defense and $49.4 billion spent by civil agencies. The agencies of the U.S. Intelligence Community that we serve represent an additional market. These numbers also exclude a large addressable market for our services and capabilities in the commercial and international markets where we have a modest but growing footprint.

132.    The 2015/16 10-K also touted its "strong and longstanding" relationships with

clients in the U.S. government, stating, in relevant part:

> We have strong and longstanding relationships with a diverse group of clients at all
> levels of the U.S. government. During fiscal 2016, we derived 97% of our revenue
> from services under more than 5,100 contracts and task orders. The revenue was
> generated from contracts where the end client was an agency or department of the
> U.S. government, including contracts where Booz Allen performed in either a
> prime or subcontract position, and regardless of the geographic location in which
> the work was performed. The single largest entity that we served in fiscal 2016was
> the U.S. Army, which represented approximately 15% of our revenue in that period.
> We derived 90% of our revenue in fiscal 2016 from engagements for which we
> acted as the prime contractor.

133.    Moreover, the 2015/16 10-K also noted the Company's efforts to comply with laws

and regulations, stating, in relevant part:

> The U.S. government may revise its procurement practices or adopt new contract
> rules and regulations at any time. In order to help ensure compliance with these
> laws and regulations, all of our employees are required to attend ethics training at
> least annually, as well as other compliance training relevant to their position.

134.    The 2015/16 10-K additionally notes the Company's requirement, as a U.S.

government contractor, to "comply with laws and regulations relating to the formation,

administration, and performance of U.S. government contracts, which affect how [the Company]

does business with [its] clients."   The 2015/16 10-K specifically notes Federal Acquisition

Regulation 52.203-13, stating that it:

> requires contractors to establish a Code of Business Ethics and Conduct, implement
> a comprehensive internal control system, and report to the government when the
> contractor has credible evidence that a principal, employee, agent, or subcontractor,
> in connection with a government contract, has violated certain federal criminal
> laws, violated the civil False Claims Act, or has received a significant overpayment.

135.    The 2015/16 10-K also references both the Code of Ethics and the Financial Officer

Code of Ethics, which both misleadingly note that the Company and its employees comply with

applicable laws and regulations.

136.    Attached to the 2015/16 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Rozanski attesting to the accuracy of the 2015/16 10-K.

### June 16, 2016 Proxy Statement

137.    On June 16, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement").  The 2016 Proxy Statement failed to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.

138.    The 2016 Proxy Statement was also false and misleading in stating that the Code of Ethics "is applicable to our directors and all employees" in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements and insider trades discussed herein.

### July 27, 2016 Press Release

139.    On July 27, 2016, the Company issued a press release announcing its financial results for the first quarter ended June 30, 2016, noting, among other things, "First Quarter Revenue of $1.42 billion," "Net Income of $67.8 million," and that the Company "expect[s] revenue to increase in the range of two percent to five percent" for the full fiscal year.

### *July 27, 2016 Earnings Call*

140.    Also on July 27, 2016, the Company held an earnings call to discuss its financial results for the first quarter ended June 30, 2016, where Defendant Rozanski touted the Company's prospects, including its "sustainable quality growth," stating, in relevant part:

> The first quarter results underscore that Booz Allen continues its path towards sustainable quality growth. We have a consistent track record of setting a plan and executing against it and that is precisely what we are doing. We believe we have made the right investments in capabilities, talent and markets to maintain our long standing position as an industry leader. We outperformed others in the industry as the federal market contracted while at the same time investing for the future, so we would be well positioned to capture demand. We are demonstrating growth earlier and faster than our competitors and believe we will continue to execute well against our plan as evidenced by our guidance for the year.

141.    During the earnings call, Defendant Howell also discussed the Company's "sustainable quality growth" in the following exchange with an analyst:

> [Robert Spingarn, Analyst, Credit Suisse Securities, LLC]
>
> Apologies. I've been jumping between calls. So this may have been asked. But I wanted to ask what the embedded margin is in the guidance. And then I also wanted to ask about the 5% or better than 5% sales growth in the quarter, which, of course, is excellent. How come the guidance for the year is 2% to 5%?
>
> [Defendant Howell]
>
> Thank you for the question. There was a previous question that got at this area. Our first quarter performance is in line with our expectations for the full year and really underscores that we're continuing to make progress towards sustainable quality growth. I think it goes without saying one quarter doesn't make for the entire year. We are going to continue to invest in areas that we're providing the return that we expect or exceeding our expectations. And so when you go back to the full-year top line and bottom-line guidance, we feel pretty confident about that and aren't making any adjustments to it at that time. Similarly with the...

142.    Defendant Howell further touted the Company's growth during the earnings call, stating, in relevant part:

> Our opportunity pipeline remains strong. Average proposal value has increased from year-ago levels and contract durations for submitted proposals and awarded

work continues to lengthen. The success we've had in winning contracts demonstrates that the market is responding well to the transformation our firm has undertaken in recent years. We are growing and reshaping our portfolio services and solutions and prioritizing opportunities that apply the full range of our capabilities from strategy consulting and change management to software development, data science, rapid prototyping, cybersecurity, engineering, and more. That's what differentiates us from competitors and paves the way to revenue growth that is high quality and sustainable over time.

143.   Also during the earnings call, Defendant Howell commented on "upward pressure on billable expenses over time" in an exchange with an analyst, as follows:

[Amit Singh, Analyst, Jefferies LLC]

All right. Great, thank you. And just quickly on the billable expenses quarter-over-quarter, they saw a growth again as a percent of revenues, so is that still related to just an increasing focus of the government toward small business set-asides? And as you're looking for the full year, how should we see billable expenses as a percent of revenue trending?

[Defendant Howell]

Sure. As we indicated last quarter, we expect some upward pressure on billable expenses over time. But for the year, we anticipate that to be at or very slightly above last year's 28% of revenue, which should not have a significant negative impact on our margins. You're correct. The government is requiring a small business and we compete very effectively in that market and need to be compliant with the government's wishes. But as I just said, we really see it just maybe being slightly above last year's 28% of revenue.

144.   Defendants Rozanski and Howell also engaged in the following exchange with an analyst during the earnings call concerning the Company's billable expenses and compliance with certain government requirements:

[Robert Spingarn ("Spingarn"), Analyst, Credit Suisse Securities, LLC]

And this may have been asked as well, but the growth in the indirect versus direct, is it parallel or is one growing more than the other, both in the quarter and in the guidance?

[Defendant Rozanski]

Indirect or billable expenses?

[Spingarn]

Well, billable expenses, I suppose.

[Defendant Rozanski]

Okay.

[Defendant Howell]

Yes. So, as we indicated last quarter, we do expect some upward pressure on billable expenses over time. But for the year, we anticipate them to be at or very slightly above last year's 28% of revenue. And this is largely the market that we're facing into and the government's requirements around small business, which we are being compliant with. So we should not have any significant negative impacts on margins throughout the year.

145.    Additionally, during the earnings call, Defendant Howell commented on potential changes in the Company's revenue obtained from the government in the following exchange with an analyst:

[Lucy Guo, Analyst, Cowen & Co. LLC]

That's helpful. And follow-up is on just maybe asking the question on receivables in another way. Has there been any changes in the collection patterns of your customers, maybe based on contract mix? And do you expect going forward throughout the year that receivables would come down as a source of cash?

[Defendant Howell]

We don't expect a fundamental change, but the change that we are seeing is attributable in large part to the indirect spending that accommodated our indirect rates in FY16. The government did change its policy on approval of revised rates, which means we're likely unable to bill and collect excess indirect spending, prior to final negotiation. But this is expected and we are adjusting accordingly.

***July 27, 2016 Form 10-Q***

146.    On July 27, 2016, the Company filed with the SEC a quarterly report for the three months ended June 30, 2016 on a Form 10-Q signed by Defendant Howell (the "1Q 2016/17 10-Q"). The 1Q 2016/17 10-Q announced the Company's operating and financial results for the quarter, reporting revenue of $1.42 billion and net income of $67.82 million, or $0.45 per diluted

share, compared to revenue of $1.35 billion and net income of $64.31 million, or $0.43 per diluted

share, for the same fiscal period in the prior year.

     147.    The 1Q 2016/17 10-Q commented on the Company's business with the U.S.

government, stating, in relevant part:

> Through our dedication to our clients' missions, and a commitment to evolving our business to address client's needs, we have longstanding and deep relationships with our clients -- some more than 75 years. We support critical missions for a diverse base of federal government clients, including nearly all of the U.S. government's cabinet-level departments, and federal contract vehicles, as well as increasingly for top-tier commercial and international clients. We support these clients by addressing complex and pressing challenges such as combating global terrorism, improving cyber capabilities, transforming the healthcare system, improving efficiency and managing change within the government.

     148.    The 1Q 2016/17 10-Q also commented on the Company's sources of revenue and

noted that "substantially all of [the Company's] revenue is derived from services provided under

contracts and task orders with the U.S. government," stating, in relevant part:

> Substantially all of our revenue is derived from services provided under contracts and task orders with the U.S. government, primarily by our consulting staff and, to a lesser extent, our subcontractors. Funding for our contracts and task orders is generally linked to trends in budgets and spending across various U.S. government agencies and departments. We provide services under a large portfolio of contracts and contract vehicles to a broad client base, and we believe that our diversified contract and client base lessens potential volatility in our business; however, a reduction in the amount of services that we are contracted to provide to the U.S. government or any of our significant U.S. government clients could have a material adverse effect on our business and results of operations. In particular, the Department of Defense is one of our significant clients, and the Budget Control Act of 2011 (as amended by the American Taxpayer Relief Act of 2012, the Bipartisan Budget Act of 2013 and the Bipartisan Budget Act of 2015), provides for automatic spending cuts totaling approximately $1.2 trillion between 2013 and 2021, and requires an estimated $500 billion in federal defense spending cuts over this time period. The Bipartisan Budget Act of 2015 raised existing spending caps on defense spending by $25 billion and $15 billion for government fiscal years 2016 and 2017, respectively, but did not address spending caps beyond fiscal 2017. A reduction in the amount of services that we are contracted to provide to the Department of Defense could have a material adverse effect on our business and results of operations, and given the uncertainty of when and how these automatic reductions

may be applied, we are unable to predict the nature or magnitude of the potential adverse effect.

149.    Attached to the 1Q 2016/17 10-Q were SOX certifications signed by Defendants Rozanski and Howell, attesting to the accuracy of the 1Q 2016/17 10-Q.

### November 2, 2016 Press Release

150.    On November 2, 2016, the Company issued a press release announcing its financial results for the second quarter ended September 30, 2016, noting, among other things, "Second Quarter Revenue Increases by 5.5 percent to $1.39 billion," "Record Backlog of $13.6 billion," "Year-over-year Headcount Increase of more than 500," and that the Company's "'strong second quarter financial results reinforce that Booz Allen is on a steady path to accelerated growth.'"

### November 2, 2016 Earnings Call

151.    Also on November 2, 2016, the Company held an earnings call discussing its financial results for the second quarter ended September 30, 2016, where Defendant Rozanski commented on the criminal investigation of a former Company employee and the Company's "adherence to the highest ethical standards," stating in relevant part:

> Let me discuss briefly an item that's been in the news. As you know, a former employee of Booz Allen is under criminal investigation. As we have communicated previously, we fired the employee as soon as we learned of his arrest and have been cooperating with the FBI investigation. In the week since the government made the case public, we have been reaching out to clients and other stakeholders. They're supportive of our efforts to cooperate with the government's investigation and to keep them informed, and we intend to stay close in touch with them as we always do. To-date, there has been no material impact on our business from the alleged criminal actions of this former employee.
>
> Booz Allen has been built on a 100-year record of client service, dedication to excellence and adherence to the highest ethical standards. We are extremely proud to support our country's civil and national security missions, and we take the trust that all our clients place in us very seriously. We work to earn it day-in and day-out.

152.    During the earnings call, Defendant Howell noted that investors could count on the Company, stating, in relevant part, "our financial results demonstrate that investors can count on us to set a plan and execute against it with discipline and focus.  We do what we say we'll do and in the near-term and over the long-term."

153.    Also during the earnings call, Defendant Howell commented on improvements to Booz Allen's business and the Company's ability to manage its indirect spending in the following exchange with an analyst:

[Jonathan Raviv, Broker, Citigroup Global Markets, Inc.]

Lloyd, I was wondering if you could just address how those higher billables impact your ability, if at all, to get that to around 10% adjusted EBITDA margin?

[Defendant Howell]

Well, in short, with a higher billability and focus on delivery, we're able to sort of generate the DL. At the same time, we are also able to – we have been able to manage our indirect spending that'd gotten out of plan last fiscal year. So the combination of the two is creating the margin improvement that we are seeing now in the business. And keep in mind, I forecasted out for the entire year. So over the course of the year, there'll be periods where we may decide to invest or to spend because it's the right thing to do. So we expect margin improvement, as I've said in the past, to occur over the course of the entire year, and we are beginning to see that. But the higher billability plus the management of our indirect spending has contributed to the margin improvements that we're experiencing.

154.    Defendant Rozanski also touted the Company's growth during the earnings call, stating, in relevant part:

Thank you very much and thanks everyone for your questions. I hope Lloyd and I have made clear the strong fundamentals of our business and the optimism we feel about Booz Allen's people to grow. This is a conversation that is largely about numbers, and so it's very difficult to convey the energy, imagination and dedication of the people of Booz Allen, while we do this. But they are what drives our firm forward year-after-year.

*November 2, 2016 Form 10-Q*

155.    On November 2, 2016, the Company filed with the SEC a quarterly report for the

three months ended September 30, 2016 on a Form 10-Q signed by Defendant Howell (the "2Q

2016/17 10-Q").  The 2Q 2016/17 10-Q announced the Company's operating and financial results

for the quarter, reporting revenue of $1.39 billion and net income of $62.93 million, or $0.41 per

diluted share, compared to revenue of $1.32 billion and net income of $56.22 million, or $0.37 per

diluted share, for the same fiscal period in the prior year.

156.    The 2Q 2016/17 10-Q commented on the Company's business with the U.S.

government, stating, in relevant part:

> Through our dedication to our clients' missions, and a commitment to evolving our
> business to address client's needs, we have longstanding and deep relationships
> with our clients -- some more than 75 years. We support critical missions for a
> diverse base of federal government clients, including nearly all of the
> U.S. government's cabinet-level departments, and federal contract vehicles, as well
> as increasingly for top-tier commercial and international clients. We support these
> clients by addressing complex and pressing challenges such as combating global
> terrorism, improving cyber capabilities, transforming the healthcare system,
> improving efficiency and managing change within the government.

157.    The 2Q 2016/17 10-Q also commented on the Company's sources of revenue and

noted that "substantially all of [the Company's] revenue is derived from services provided under

contracts and task orders with the U.S. government," specifically stating, in relevant part:

> Substantially all of our revenue is derived from services provided under contracts
> and task orders with the U.S. government, primarily by our consulting staff and, to
> a lesser extent, our subcontractors. Funding for our contracts and task orders is
> generally linked to trends in budgets and spending across various U.S. government
> agencies and departments. We provide services under a large portfolio of contracts
> and contract vehicles to a broad client base, and we believe that our diversified
> contract and client base lessens potential volatility in our business; however, a
> reduction in the amount of services that we are contracted to provide to the U.S.
> government or any of our significant U.S. government clients could have a material
> adverse effect on our business and results of operations. In particular, the
> Department of Defense is one of our significant clients, and the Budget Control Act
> of 2011 (as amended by the American Taxpayer Relief Act of 2012, the Bipartisan

Budget Act of 2013 and the Bipartisan Budget Act of 2015), provides for automatic spending cuts totaling approximately $1.2 trillion between 2013 and 2021, and requires an estimated $500 billion in federal defense spending cuts over this time period. The Bipartisan Budget Act of 2015 raised existing spending caps on defense spending by $25 billion and $15 billion for government fiscal years 2016 and 2017, respectively, but did not address spending caps beyond fiscal 2017. A reduction in the amount of services that we are contracted to provide to the Department of Defense could have a material adverse effect on our business and results of operations, and given the uncertainty of when and how these automatic reductions may be applied, we are unable to predict the nature or magnitude of the potential adverse effect.

158.    Attached to the 2Q 2016/17 10-Q were SOX certifications signed by Defendants Rozanski and Howell, attesting to the accuracy of the 2Q 2016/17 10-Q.

### January 30, 2017 Press Release

159.    On January 30, 2017, the Company issued a press release announcing its financial results for the third quarter ended December 31, 2016, noting, among other things, "Third Quarter Revenue Increases by 7.4 percent to $1.40 billion," "Continued Strong Backlog of $13.5 billion," "Headcount Increase of approximately 440 year-over-year," and that the Company "continues to grow on a healthy trajectory."

### January 30, 2017 Earnings Call

160.    Also on January 30, 2017, the Company held an earnings call discussing its financial results for the third quarter ended December 31, 2016, where Defendant Howell touted the Company's prospects, stating, in relevant part:

I think the best way to summarize our third quarter is that we remain on a solid growth path because we are executing with discipline against both our plan for the fiscal year and our strategy for the future. We have a near-term plan for business operations that supports our long-term strategy for growth. And we are executing exactly according to our plan for FY 2017. That's how we run the business year-after-year, setting a plan and then managing with foresight and agility, so that we can position ourselves for the next year, the next year and so on.

161.    During the conference call, Defendant Howell also commented on the Company's "uptick in billable expenses" in the following exchange with an analyst:

[Amit Singh, Analyst, Jefferies LLC]

Hi, guys. Thank you for taking my question and strong top line performance. So just regarding the guidance for the full year, could you help me understand how much of that raise in guidance is sort of from the Aquilent M&A and I guess slightly higher expectation for billable expenses? Earlier you were expecting 29% to 30%. Now I think you're expecting 30% versus general improvement in the demand environment.

[Defendant Howell]

Amit, thank you for the question. It's a combination of all of the above. As I said in my opening comments, we expect $20 million from the Aquilent acquisition that contribute to the top line. As I also mentioned with a slight uptick in billable expenses due to small business set aside, particularly in our defense and intelligence markets, that's the market that we compete in and we are responding accordingly.

### *January 30, 2017 Form 10-Q*

162.    On January 30, 2017, the Company filed with the SEC a quarterly report for the three months ended December 31, 2016 on a Form 10-Q signed by Defendant Howell (the "3Q 2016/17 10-Q"). The 3Q 2016/17 10-Q announced the Company's operating and financial results for the quarter, reporting revenue of $1.40 billion and net income of $55.59 million, or $0.37 per diluted share, compared to revenue of $1.31 billion and net income of $108.06 million, or $0.71 per diluted share, for the same fiscal period in the prior year.

163.    The 3Q 2016/17 10-Q commented on the Company's business with the U.S. government, stating, in relevant part:

Through our dedication to our clients' missions, and a commitment to evolving our business to address clients' needs, we have longstanding and deep relationships with our clients -- some more than 75 years. We support critical missions for a diverse base of federal government clients, including nearly all of the U.S. government's cabinet-level departments, and federal contract vehicles, as well as increasingly for top-tier commercial and international clients. We support these clients by addressing complex and pressing challenges such as combating global terrorism, improving cyber capabilities, transforming the healthcare system, improving efficiency and managing change within the government.

164.     The 3Q 2016/17 10-Q also commented on the Company's sources of revenue and noted that "substantially all of [the Company's] revenue is derived from services provided under contracts and task orders with the U.S. government," specifically stating, in relevant part:

> Substantially all of our revenue is derived from services provided under contracts and task orders with the U.S. government, primarily by our consulting staff and, to a lesser extent, our subcontractors. Funding for our contracts and task orders is generally linked to trends in budgets and spending across various U.S. government agencies and departments. We provide services under a large portfolio of contracts and contract vehicles to a broad client base, and we believe that our diversified contract and client base lessens potential volatility in our business; however, a reduction in the amount of services that we are contracted to provide to the U.S. government or any of our significant U.S. government clients could have a material adverse effect on our business and results of operations. In particular, the Department of Defense is one of our significant clients, and the Budget Control Act of 2011 (as amended by the American Taxpayer Relief Act of 2012, the Bipartisan Budget Act of 2013 and the Bipartisan Budget Act of 2015), provides for automatic spending cuts totaling approximately $1.2 trillion between 2013 and 2021, and requires an estimated $500 billion in federal defense spending cuts over this time period. The Bipartisan Budget Act of 2015 raised existing spending caps on defense spending by $25 billion and $15 billion for government fiscal years 2016 and 2017, respectively, but did not address spending caps beyond fiscal 2017. A reduction in the amount of services that we are contracted to provide to the Department of Defense could have a material adverse effect on our business and results of operations, and given the uncertainty of when and how these automatic reductions may be applied, we are unable to predict the nature or magnitude of the potential adverse effect.

165.     Attached to the 3Q 2016/17 10-Q were SOX certifications signed by Defendants Rozanski and Howell, attesting to the accuracy of the 3Q 2016/17 10-Q.

**May 22, 2017 Form 10-K**

166.     On May 22, 2017, the Company filed with the SEC its annual report for the quarter and year ended March 31, 2017 on a Form 10-K signed by Defendants Rozanski, Howell, Shrader, Amble, Barnes, Clare, Fujiyama, Gaumond, Johnson, McClain, Odeen, and Rossotti (the "2016/17 10-K").  The 2016/17 10-K announced the Company's operating and financial results for the quarter, reporting revenue of $1.58 billion and net income of $66.25 million, or $0.44 per diluted share, compared to revenue of $1.42 billion and net income of $65.52 million, or $0.43 per diluted

share, for the same fiscal period in the prior year. For the year, the 2016/17 10-K reported revenue of $5.80 billion and net income of $252.49 million, or $1.67 per diluted share, compared to revenue of $5.41 billion and net income of $294.09 million, or $1.94 per diluted share, for the prior fiscal year.

167. The 2016/17 10-K commented on the Company's business with the U.S. government, stating, in relevant part:

> Through our dedication to our clients' missions, and a commitment to evolving our business to address client needs, we have longstanding and deep relationships with our clients, some more than 75 years. We support critical missions for a diverse base of federal government clients, including nearly all of the U.S. government's cabinet-level departments, as well as increasingly for top-tier commercial and international clients. We support these clients by helping them tackle their most complex and pressing challenges such as protecting soldiers in combat and supporting their families, advancing cyber capabilities, keeping our national infrastructure secure, enabling and enhancing digital services, transforming the healthcare system, and improving governmental efficiency to achieve better outcomes.
>
> * * *
>
> Booz Allen is committed to solving our clients' toughest challenges, and we work with a diverse base of public-and-private sector clients across a number of industries, in the U.S. and internationally.
>
> Our clients call upon us to work on their hardest problems, such as delivering effective health care, protecting soldiers in combat and their families and keeping our national infrastructure secure. We are investing in markets, capabilities, and talent and are building new business models through strategic ventures, partnerships, and product offerings.
>
> Our government clients include substantially all of the cabinet-level departments of the U.S government. We serve commercial clients across all industries, including some of the largest organizations in critical infrastructure sectors, such as financial services, energy, healthcare, and manufacturing, and we have a thriving portfolio of international clients in the Middle East and Southeast Asia.

168. The 2016/17 10-K also noted the importance of the U.S. government to the Company's business, stating, in relevant part:

We believe that the U.S government is the world's largest consumer of management and technology consulting services. The U.S. government's budget for its fiscal year ended September 30, 2016 was close to $3.9 trillion, excluding authorizations from Overseas Contingency Operations and supplemental funding for the Department of Defense. Of this amount, approximately $1.2 trillion was for discretionary budget authority, including $631 billion for the Department of Defense and intelligence community and $563 billion for civil agencies. Based on data from the Federal Procurement Data System, approximately $473 billion of the U.S. government's fiscal year 2016 discretionary outlays were non-intelligence agency funding-related products and services procured from private contractors. We estimate that $119.6 billion of the spending directed towards private contractors in U.S. government fiscal year 2016 was for management, technology, and engineering services, with $67.2 billion spent by the Department of Defense and $52.4 billion spent by civil agencies. The agencies of the U.S. intelligence community that we serve represent an additional market. These numbers also exclude a large addressable market for our services and capabilities in the global commercial markets where we have a modest but growing footprint.

During Booz Allen's fiscal 2017:

- We derived 97% of our revenue from contracts where the end client was an agency or department of the U.S. government.

- We delivered services under more than 4,820 contracts and task orders.

- We derived 91% of our revenue in fiscal 2017 from engagements for which we acted as the prime contractor.

- The single largest entity that we served in fiscal 2017 was the U.S. Army, which represented approximately 14% of our revenue in that period.

169.    The 2016/17 10-K also discussed the Company's "Purpose and Values," stating, in

relevant part:

*Purpose and Values.* As one of the first organizations in the United States to adopt a formal code of business ethics, we have always believed that doing what's right and holding ourselves and others accountable is the only way to do business. Our people are drawn by our purpose to "empower people to change the world" and live our values:

- Ferocious Integrity: Do right; hold ourselves accountable

- Unflinching Courage: Speak truth to power; maintain convictions; bring bold thinking

- Passionate Service: Embrace the mission; build community through generosity; make meaningful connections; listen and act with empathy

- Collective Ingenuity: find the biggest problem and solve it; be resourceful and creative; seek to make the biggest difference; harness the power of diversity; be devoted to the team

- Champion's Heart: Crave being the best; bring joy to the pursuit; learn from failure; compete with passion

170.    The 2016/17 10-K also noted the Company's efforts to comply with laws and regulations, stating, in relevant part:

> The U.S. government may revise its procurement practices or adopt new contract rules and regulations at any time. In order to help ensure compliance with these laws and regulations, all of our employees are required to attend ethics training at least annually, as well as other compliance training relevant to their position.

171.    The 2016/17 10-K additionally noted the Company's requirements, as a U.S. government contractor, to "comply with laws and regulations relating to the formation, administration, and performance of U.S. government contracts, which affect how [the Company] do[es] business with [its] clients."   The 2016/17 10-K specifically notes Federal Acquisition Regulation 52.203-13, stating that it:

> requires contractors to establish a Code of Business Ethics and Conduct, implement a comprehensive internal control system, and report to the government when the contractor has credible evidence that a principal, employee, agent, or subcontractor, in connection with a government contract, has violated certain federal criminal laws, violated the civil False Claims Act, or has received a significant overpayment.

172.    The 2016/17 10-K also referenced both the Code of Ethics and the Financial Officer Code of Ethics, which both misleadingly noted that the Company and its employees comply with applicable laws and regulations.

173.    Attached to the 2016/17 10-K were SOX certifications signed by Defendants Rozanski and Howell, attesting to the accuracy of the 2016/17 10-K.

*May 22, 2017 Earnings Call*

174.    On May 22, 2017, the Company held an earnings call discussing its financial results

for the fiscal quarter and year ended March 31, 2017, where Defendant Rozanski touted the

Company's quarter and full year 2017 performance, stating, in relevant part:

> As we saw in our press release this morning, we had a great fourth quarter allowing
> us to deliver better than expected results for the full year. Our FY '17 performance
> demonstrates the fundamental strength of our business and confirms Booz Allen's
> position as the industries organic growth leader. A record of growth is grounded in
> a virtual cycle. It begins with our commitment to adding exceptional value to clients
> at the core of their mission priorities.

175.    During the earnings call, Defendant Howell commented on the Company's

"industry-leading revenue growth" as "an engine for sustainable shareholder value creation,"

stating, in relevant part:

> This is a firm that sets a plan and executes relentlessly. We have done that with our
> year-to-year performance and our long-term strategy for growth. Our latest results
> demonstrate the fundamental strength of our business and our management team.
> They are the product of our success operationally and strategically and set us up for
> another year of accelerated growth for FY '18. As Horacio pointed out, industry
> leading revenue growth is an engine for sustainable shareholder value creation. We
> remain committed to generating near and long-term shareholder value through
> revenue growth, operational excellence and effective capital deployment.  You will
> find them on Slide 5. Revenue increased 7.4% compared to fiscal year 2016, that's
> a great number and is driven by client demand. Throughout the year, we efficiently
> deployed our people on to contracts and delivered high quality service and solutions
> to clients. The revenue growth exceeded our expectations because of strong direct
> labor generation in the fourth quarter along with continued high billable expenses.

                                              * * *

> I'm pleased to report strong results for the year. Operating income and adjusted
> operating income were up 8.9% and 9.6% respectively, due primarily to revenue
> growth and the positive impact of lower and direct spending. When compared to
> FY '16, adjusted net income increased 6.5% to $262 million a net income decreased
> 14.2% to $252 million. Net income had benefitted in FY '16 from a non-recurring
> release of certain income tax reserves totaling $53 million. Adjusted EBITDA grew
> 8.1% compared with the prior year to $547 million and adjusted EBITDA margin
> was 9.4% on par with FY '16.

The result reflects the increase in billable expenses as a percentage of revenue compared to the prior year. ADEPS for the year was a $1.75, exceeding by a penny the top of our revised guidance range due to our strong fourth quarter performance. Another indicator of the fundamental strength of our business is the improvement we saw in our cash position during FY '17. The changes due to revenue growth, spending discipline, and cash tax savings. Cash from operations was 53% higher in fiscal 2017 than in the previous year and capital expenditures were $54 million, slightly below our latest projection. As a result, our free cash flow to adjusted net income ratio was 1.25.

176.    In his closing remarks, Defendant Rozanski touted the Company's culture and values, such as integrity, stating, in relevant part:

Thank you very much everyone for your questions. As I close the year today, I want to return for the reasons of our success in FY '17 in addition to the progress we made operationally and strategically and the numbers that accompany it, which were the vast conversations of this call. We thought it was culture actually played a crucial role. It's always been the fundamental driver of our performance as a firm, and actually it's an investment as well. Those of you who are familiar with our story know that we prosecute the market differently, and we operate with a unique business model that grants us both speed and agility.

Our clients often remark that people are fully committed to their success and that sets them apart and is we owned a simple execution of the contract. It sometimes have to explain how we do it, but the consistently of our performance says that there is something unique in who we are. So this past year, we took the time to put those intangibles into words so they can continue to propel us as our size, market presence and diversity of portfolio expand. I am proud to share with you a brief synthesis.

Put simply, Booz Allen's purpose is to empower people to change the world and I think that perfectly captures the motivation and mission focus of our people. Our firm's values and our ferocious integrity, passionate service and collective ingenuity, unflinching courage and a champion's heart and they are much more than words. They set the standards and demand action. They involve things like speaking truth to power, harnessing the power of diversity and finding problems and solving them. These words matter tremendously to the people of Booz Allen.

177.    Defendant Rozanski continued:

The journey to write to them down over the past year has created connection, unity and energy. And they matter to our clients because they speak of the ethics and integrity that ground the virtuous cycle I described before. So for those reasons, we also believe they mattered to our investors. Our purpose and our values command Booz Allen to never standstill, never be satisfied, never cut corners and never settle and whether it's to retain the best people, to solve the toughest problems or to drive

the up-market TCR, we are committed to simply being the best. We have a great record in doing so and intend to do even better going forward.

**The Truth Emerges**

***June 15, 2017 Form 8-K***

178.    On June 15, 2017, the Company filed a current report on Form 8-K with the SEC announcing that Booz Allen Hamilton Inc. was notified that the DOJ is conducting a criminal and civil investigation into Booz Allen Hamilton Inc. related to certain elements of Booz Allen Hamilton Inc.'s cost accounting and indirect cost charging practices with the U.S. government. The Form 8-K stated, in relevant part:

> On June 7, 2017, Booz Allen Hamilton Inc. (the "Company"), a wholly owned subsidiary of Booz Allen Hamilton Holding Corporation, was informed that the U.S. Department of Justice is conducting a civil and criminal investigation relating to certain elements of the Company's cost accounting and indirect cost charging practices with the U.S. government. To date, our internal and external audit processes have not identified any significant deficiencies or material weaknesses, or identified any significant erroneous cost charging. The Company is cooperating with the government in these matters and expects to bring them to an appropriate resolution.

179.    On this news, the price per share of Booz Allen stock fell $7.43, or 18.9%, from the previous day's closing price to close at $31.90 on June 16, 2017.

***August 7, 2017 Form 10-Q***

180.    According to the Company's Form 10-Q filed with the SEC on August 7, 2017, "the DOJ has requested information from the Company" in connection with its investigation.[8]

---

[8] The Company's August 7, 2017 Form 10-Q provides substantially the same information regarding the DOJ's investigation as the Company's June 15, 2017 Form 8-K, but states that the DOJ investigation relates to the *Company's* practices, not specifically Booz Allen Hamilton Inc.'s practices, as noted in the Form 8-K. Nonetheless, the Form 10-Q includes Booz Allen Hamilton Inc. in its definition of the term "Company," in addition to Booz Allen Hamilton Holding Corporation.

### *August 7, 2017 Earnings Call*

181.    On August 7, 2017, the Company held an earnings call discussing its financial results for the first quarter ended June 30, 2017, where Defendant Rozanski further acknowledged the DOJ's investigation of the Company and noted that the investigation is more likely to take years than just months due to the complexity of the cost accounting issues and the stage of the investigation.  He stated, in relevant part:

> Before I go any further, let me address the Department of Justice investigation that we disclosed on June 15. We do not have new information to share today, but I'll underscore that resolution of this matter is of great importance to our institution and of course to our shareholders. We have a talented team dedicated to this matter, and we are co-operating with the government. The rest of the firm remains focused on running the business. Because the DOJ investigation is ongoing, there are and will remain limits to what we can say about it.

> The key points are these. We continue to believe that the DOJ is focused on certain elements of the company's cost accounting and indirect cost charging practices with the U.S. government. We do not believe our GAAP accounting or financial reporting practices are the focus of the investigation. Our firm has not been charged with any wrongdoing and we are working with the government to reach an appropriate resolution. The timeline for resolution remains uncertain, but given the complexity of cost accounting issues and the fact that we are still in the early stages of the investigation, we believe it is more likely to be years than months. We're staying close to our clients as we always do and keeping lines of communication open to all stakeholders including employees, strategic partners, regulators and investors. To date, we do not believe there has been any negative impact to our client relationships, nor is there any indication of negative impact on our ability to perform on existing contracts, bid on new ones, or recruit and retain talent.

> In sum, the investigation is an important matter that we are taking very seriously, but it will progress on its own timeline and in its own space. It will be handled by a dedicated team of legal and financial experts with the support of experienced outside counsel. The vast majority of our firm meanwhile continues to focus on solving problems for clients, supporting their missions and advancing the priorities that fueled our return to growth and have positioned Booz Allen for a bright future.

182.    Defendant Rozanski's comments were in stark contrast to the Company's June 15, 2017 press release that implied that the investigation would be resolved sooner rather than later due to its statement that the Company "is cooperating with the government in these matters and

expects to bring them to an appropriate resolution."  In fact, the following exchange during the

earnings call specifically notes an analyst's surprise in hearing that the investigation might take

years:

[Cai von Rumohr, Analyst, Cowen & Company, LLC]

Thank you.  Just a quick follow up.  You've mentioned that it might take years and
not months to settle the DOJ investigation.  That seems a little surprising, but maybe
you could kind of give some more color on that comment?

[Defendant Rozanski]

As I said in the comments, these are complex topics. It takes a while for an
investigation like this to ramp up and get up to speed. Beyond that, DOJ will
manage it as they see fit and we will cooperate and assist, and we'll go from there.
We would love to see this resolve as quickly as possible, but it'll take however long
it takes.

183.    During the earnings call, Defendant Rozanski engaged in the following exchange

with an analyst, where he side-stepped questions regarding the scope of the DOJ's investigation:

[Jonathan Raviv, Analyst, Citigroup Global Markets, Inc.]

Hi. Thanks so much for taking the follow-up. Sorry of follow-up on the
investigations, wanted to get some idea. Is it possible for you to at all cordon off or
draw a circle around where some of the issues might be; is it company-wide, a
particular office, a particular group? Just to get a sense for how broad or not broad
this might be?

[Defendant Rozanski]

We're at the early stages of the investigation. We are in dialogue with the
Department of Justice, but we are not in a position at this point to go beyond what
we've already shared in the 8-K and on this call.

### *August 9, 2017 Jefferies Industrials Conference Call*

184.    On August 9, 2017, Defendants Rozanski and Howell made a presentation and

participated in a question-and-answer session in a Jefferies Industrials Conference Call.  During

the conference call, Defendants Rozanski and Howell engaged in the following exchange with an

analyst regarding the DOJ's investigation, where they avoided providing additional detail:

[Unidentified Analyst]

. . . Am I right in saying that given contract could have a lot of task orders
underneath it, could you tell me on this site is – in relation to obviously the DOJ
investigation and to the extent you can't comment, is the contract cost accounting
done at the task order level or the main contract level.

[Defendant Rozanski]

It's a difficult question to answer. The right answer is all of the above. You measure
cost from the hourly level, to the task order level, to the contract level, to the
enterprise level.

[Unidentified Analyst]

I mean I guess the reason I asked is because obviously if it is at the task order level,
it seems unfathomable, but the DOJ could have any impacts to grow into here,
because there are so many different task orders that you would have to have so
many different people engaging in the listed activity, so unless the entire
organization is engaging in such activity, it's seems impossible that – anyway that's
just me sounding from my sounding word?

[Defendant Rozanski]

Okay.

* * *

[Defendant Howell]

We have consistently said that at this early stage in the process, we don't have a
tremendous amount to share differently than what we have already shared. And we
don't want to be in a position where we are speculating. And I know your question
is and the questions we have received today aren't trying to get us to do that. But
we are sharing what we can, what we know and we have made a commitment to do
that and so we are going to leave it there.

## **Repurchases**

185.     During the period in which the Company made false and misleading statements

and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its

common stock at artificially inflated prices that substantially damaged the Company. As the Company stock was actually only worth $31.90 per share, the price at which it was trading on June 16, 2017,[9] the Company overpaid approximately $7.8 million in total for these repurchases.

186. According to the 2016/17 10-K, during the three months ended March 31, 2017, the Individual Defendants caused the Company to repurchase 1,231,167 shares of its own common stock at an average price per share of approximately $35.82, for a total cost to the Company of approximately $44.1 million.

187. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $3.92 more than the actual worth of each share during the three months ended March 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2017 was approximately $4.8 million.

188. According to the Company's Form 10-Q filed with the SEC on August 7, 2017, in April 2017, the Individual Defendants caused the Company to repurchase 970,300 shares of its own common stock at an average price per share of approximately $34.97, for a total cost to the Company of approximately $33.9 million.

189. Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $3.07 more than the actual worth of each share during the month of April 2017. Thus, the total over payment by the Company for its repurchases of its own stock during April 2017 was approximately $3.0 million.

---

[9] June 16, 2017 was the first trading day following the Company's announcement of the DOJ investigation into the Company.

190.    In total, the Company overpaid an aggregate amount of approximately $7.8 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

### Summary of Individual Defendants' Misconduct

191.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.

192.    Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the foregoing false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

193.    The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Fraudulent Misconduct.

194.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, the Individual Defendants caused the Company to overpay for repurchases of Company stock and three of the Individual Defendants benefitted themselves by engaging in insider sales.

195.    In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

## DAMAGES TO BOOZ ALLEN

196.    As a direct and proximate result of the Individual Defendants' conduct, Booz Allen will lose and expend many millions of dollars.

197.    Such losses include the Company's overpayment by more than $7.8 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein .

198.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and two of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

199.    Such losses include, but are not limited to, those incurred and to be incurred by the Company in responding to the investigation by the DOJ into the Company.

200.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

201.    As a direct and proximate result of the Individual Defendants' conduct, Booz Allen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

202.    Plaintiff brings this action derivatively and for the benefit of Booz Allen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Booz Allen, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

203.    Booz Allen is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

204.    Plaintiff is, and has been at all relevant times, a Booz Allen shareholder.  Plaintiff will adequately and fairly represent the interests of Booz Allen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

205.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

206.    A pre-suit demand on the Board of Booz Allen is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following 11 Individual Defendants: Rozanski, Shrader, Clare, Amble, Barnes, Fujiyama, Gaumond, McClain, Odeen, Rossotti, and Johnson (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to six of the 11 Directors who are on the Board at the time this action is commenced.

207.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the false and misleading statements and omissions of material fact while two of them engaged in insider sales based on material non-public information netting proceeds of over $4.9 million and at the same time caused the Company to overpay $7.8 million for repurchases of its own stock, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

208.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, three of the Individual Defendants, including two of the Company's Directors, collectively sold over $10.9 million worth of Company stock at artificially inflated prices based on inside material information.

209.    In further abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in and/or caused the Company to engage in the Fraudulent Misconduct.

210.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

211.    Additional reasons that demand on Defendant Rozanski is futile follow.  Defendant Rozanski is the Company's Chief Executive Officer, and is thus, as the Company admits, a non-independent director.  Indeed, the Company compensated him with over $3.0 million in fiscal 2017.  Defendant Rozanski was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, many of which he signed and personally made.  Additionally, he is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  His insider sale before the

fraud was exposed, which yielded approximately $4.6 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Rozanski is a defendant in the Securities Class Action. Defendant Rozanski's large Company stock holding, worth over $29.9 million on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible. Finally*, Defendant Rozanski conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Rozanski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.   Additional reasons that demand on Defendant Shrader is futile follow. Defendant Shrader has served as a Company director since 2008 and is Chairman of the Board. He also formerly served as the Company's CEO. Additionally, Defendant Shrader's son is a Vice President at the Company, and Defendant Shrader may fear retaliation against his son if he grants a demand. Thus, as the Company admits, he is a non-independent director. Defendant Shrader was compensated with $410,013 in fiscal 2017, so lacks independence. Defendant Shrader's large Company stock holding, comprising almost 1.2% of the Company's issued and outstanding common stock and worth approximately $67.9 million on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director, Defendant Shrader conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S.

government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Shrader breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Clare is futile follow. Defendant Clare has served as a Company director since 2008. Defendant Clare's large Company stock holding, worth approximately $133,227 on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director, Defendant Clare conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2)

revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Clare breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Amble is futile follow.  Defendant Amble has served as a Company director since 2012.  She was compensated with $210,008 in fiscal 2017, so lacks independence.  Defendant Amble's large Company stock holding, worth approximately $988,430 on June 8, 2017, reveals her interest in keeping the Company's stock price as high as possible.  As a long-time director and member of the Audit Committee, Defendant Amble conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets.  Moreover, she signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  She is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company

failed to maintain internal controls.  Thus, for these reasons, too, Defendant Amble breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.  Additional reasons that demand on Defendant Barnes is futile follow.  Defendant Barnes has served as a Company director since 2015.  She was compensated with $210,008 in fiscal 2017, so lacks independence.  Defendant Barnes's large Company stock holding, worth approximately $263,731 on June 8, 2017, reveals her interest in keeping the Company's stock price as high as possible.  As a director, Defendant Barnes conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  She is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  Thus, for these reasons, too, Defendant Barnes breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216.    Additional reasons that demand on Defendant Fujiyama is futile follow.  Defendant Fujiyama's large Company stock holding, worth approximately $133,227 on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director, Defendant Fujiyama conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  Thus, for these reasons, too, Defendant Fujiyama breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Gaumond is futile follow.  Defendant Gaumond has served as a Company director since 2011.  He was compensated with $240,001 in fiscal 2017, so lacks independence.  Defendant Gaumond's large Company stock holding, worth approximately $1.5 million on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and Chair of the Audit Committee, Defendant Gaumond conducted little, if any, oversight of the Company's internal controls and of the schemes

to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein. He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls. Thus, for these reasons, too, Defendant Gaumond breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant McClain is futile follow. Defendant McClain has served as a Company director since 2014. She was compensated with $210,013 in fiscal 2017, so lacks independence. Defendant McClain's large Company stock holding, worth approximately $726,916 on June 8, 2017, reveals her interest in keeping the Company's stock price as high as possible. As a long-time director, Defendant McClain conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading

statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  She is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  Thus, for these reasons, too, Defendant McClain breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

219.    Additional reasons that demand on Defendant Odeen is futile follow.  Defendant Odeen has served as a Company director since 2008.  He was compensated with $225,007 in fiscal 2017, so lacks independence.   His insider sale before the fraud was exposed, which yielded $340,600 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Defendant Odeen's large Company stock holding, worth approximately $1.7 million on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director, Defendant Odeen conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct;  (2) revenues obtained from Booz Allen's

services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  Thus, for these reasons, too, Defendant Odeen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on Defendant Rossotti is futile follow.  Defendant Rossotti has served as a Company director since 2008.  He was compensated with $210,008 in fiscal 2017, so lacks independence.  Defendant Rossotti's large Company stock holding, worth approximately $4.5 million on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and member of the Audit Committee, Defendant Rossotti conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  Thus, for these reasons, too, Defendant Rossotti breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221.    Additional reasons that demand on Defendant Johnson is futile follow.  Defendant Johnson has served as a Company director since 2011.  He was compensated with $210,013 in fiscal 2017, so lacks independence.  Defendant Johnson's large Company stock holding, worth approximately $811,157 on June 8, 2017, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and member of the Audit Committee, Defendant Johnson conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in improper accounting and charging practices with regard to Booz Allen's business with the U.S. government and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Moreover, he signed, and thus personally made, the false and misleading statements in the 2015/16 10-K & 2016/17 10-K that are referenced herein.  He is liable for causing the Company to fail to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.  Thus, for these reasons, too, Defendant Johnson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

222.    Additional reasons that demand on the Board is futile follow.

223.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

224.    As described above, two of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Rozansky and Odeen received proceeds in excess of $4.9 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

225.    Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $7.8 million for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

226.    Booz Allen has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Booz Allen any part of the damages Booz Allen suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

227.    The Individual Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own stock, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

228.    The acts complained of herein constitute violations of fiduciary duties owed by Booz Allen's officers and directors, and these acts are incapable of ratification.

229.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Booz Allen.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the

officers of Booz Allen, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

230.    If there is no directors' and officers' liability insurance, then the Directors will not cause Booz Allen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

231.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

232.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

234.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

235.    Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.

236.    The 2016 Proxy Statement was also false and misleading in stating that the Code of Ethics "is applicable to our directors and all employees" in light of the violations of the Code of Ethics engaged in by the Individual Defendants, including through the false and misleading statements and insider trades discussed herein.

237.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 Proxy Statement, including but not limited to, election of directors and ratification of the appointment of an independent auditor.

238.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy Statement.

239.   Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of**
**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

240.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Booz Allen.  Not only is Booz Allen now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Booz Allen by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $78 million of its own shares on the open market at artificially-inflated prices, damaging Booz Allen by millions of dollars.

242.   The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

243.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Booz Allen not misleading.

244.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Booz Allen.

245.    The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

246.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-Ks filed with the SEC during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, including Defendants Rozanski, Shrader, Amble, Barnes, Clare, Fujiyama, Gaumond, Johnson, McClain, Odeen, and Rossotti, who signed the 2015/16 and 2016/17 10-Ks, and Defendant Howell, who signed the 2016/17 10-K.

247.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

248.    Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a)
### of the Securities Exchange Act of 1934

249.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.    The Individual Defendants, by virtue of their positions with Booz Allen and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Booz Allen and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Booz Allen to engage in the illegal conduct and practices complained of herein.

251.    Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

252.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

253.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Booz Allen's business and affairs.

254.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

255.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.

The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Booz Allen.

256.    In breach of their fiduciary duties owed to the Company, the Individual Defendants caused Booz Allen to engage in the Fraudulent Misconduct.

257.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

258.    In further breach of their fiduciary duties owed to Booz Allen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements of material fact. Specifically, Defendants failed to disclose that: (1) the Company engaged in the Fraudulent Misconduct; (2) revenues obtained from Booz Allen's services for the U.S. government were unsustainable and also inflated; (3) such misconduct, upon discovery, would subject Booz Allen to potential civil and criminal sanctions, subject the Company to increased regulatory scrutiny, and endanger its U.S. government business relationships; and (4) the Company failed to maintain internal controls.

259.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

260.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.  Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing its own stock.

261.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Booz Allen's securities and disguising insider sales.

262.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Booz Allen's securities and engaging in insider sales.

263.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

264.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Booz Allen has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

265.    Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

266.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Booz Allen.

268.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Booz Allen that was tied to the performance or artificially inflated valuation of Booz Allen, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

269.    Plaintiff, as a shareholder and a representative of Booz Allen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation (including any performance-based or valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

270.    Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

271.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Booz Allen, for which they are legally responsible.

273.     As a direct and proximate result of the Individual Defendants' abuse of control, Booz Allen has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Booz Allen has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

274.     Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

275.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

276.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Booz Allen in a manner consistent with the operations of a publicly-held corporation.

277.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Booz Allen has sustained and will continue to sustain significant damages.

278.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

279.     Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

280.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

281.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Booz Allen to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.  In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

282.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

283.    Plaintiff, on behalf of Booz Allen, has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Booz Allen, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Booz Allen;

(c)    Determining and awarding to Booz Allen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Booz Allen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Booz Allen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and

the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2.  a provision to permit the shareholders of Booz Allen to nominate at least six candidates for election to the board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)     Awarding Booz Allen restitution from Individual Defendants, and each of them;

      (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)   Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

      Plaintiff hereby demands a trial by jury.

Dated: November 13, 2017              Respectfully submitted,

Of Counsel:                     **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**     /s/ Brian E. Farnan
Phillip Kim                       Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 34th Floor      Michael J. Farnan (Bar No. 5165)
New York, NY 10016              919 N. Market St., 12th Floor
Telephone: (212) 686-1060         Wilmington, DE 19801
Facsimile: (212) 202-3827          Telephone: (302) 777-0300
Email: pkim@rosenlegal.com       Facsimile: (302) 777-0301
                                 Email: bfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**     Email: mfarnan@farnanlaw.com
Timothy W. Brown

240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net          *Attorneys for Plaintiff*